
EXHIBIT B

## AMERICAN ARBITRATION ASSOCIATION

In the Matter of:

TEAMSTERS LOCAL NO. 830

and

PHILA. COCA-COLA BOTTLING CO.

AAA Case No. 14 300 00357 01
(Gr: FMLA Leave)

Hearing Dates: October 23, 2001 and
January 25, 2002

Decision Date: May 7, 2002

For the Union: Thomas W. Jennings, Esquire, SAGOT, JENNINGS & SIGMOND
For the Employer: Michael G. Tierce, Esquire, SCHNADER, HARRISON, SEGAL & LEWIS

### Introduction and Relevant Facts

Teamsters Local No. 830 has a long standing collective bargaining relationship with the Philadelphia Coca-Cola Bottling Co. The dispute in this case centers on the Company's application of its Family and Medical Leave Act (FMLA) policy.

The FMLA (passed in 1993) provides employees the right to take unpaid leave of absence, subject to certain conditions, for the purpose of tending to illnesses or injuries suffered by the employee and/or his family members. The FMLA permissively grants the Employer the option of requiring employees to use paid leave time (e.g., vacation, personal, sick days) concurrently with FMLA leave.

Prior to spring/summer 2000, the Company did not, as a matter of *practice*, require employees to use paid leave time concurrently with FMLA leave. Its written policy, dated 1998 and revised in 2000, provided that "the Company reserves the right to coordinate FMLA leave with vacation, sick, workers' compensation, or other agreed upon or contractual types of paid leave".

Luis Fonseca was hired by the Company in 1999 as the Director of Labor Relations. In his new role, he reviewed the FMLA policy and concluded that the policy

1

allowed the Company to require employees to use paid leave concurrent with FMLA leave. In conversations with his superior and other management employees, he discovered that the Company did not enforce such a requirement in practice. As early as June 2000, the Employer began requiring employees to use paid leave concurrent with FMLA leave.

By letter dated August 9, 2000, Sarah Ruszin, then-Vice President of Local 830 and the primary business agent for the employees at Coca-Cola,[1] informed Fonseca that she "received many calls from our members...inquiring on the use of FMLA". She stated further that "there seems to be some controversy on how Philadelphia Coca-Cola administers its policy". Ruszin requested "a copy of the company policy on FMLA and how the policy is administered".

Fonseca and Ruszin had several conversations between the August letter and November 1, 2000. On the latter date, Fonseca wrote to Ruszin,

> "Per your request I have attached the Company policy regarding Family and Medical Leave.
> I am grateful that after several meetings and discussions, we can finally say all issues regarding the Company policy and position, how we administer our leaves have been addressed. The Company will continue to pay out accrued vacation and personal time to all employees who qualify and are granted Family and Medical Leave."

Ruszin was defeated in her union election during the first week of November 2000. She did not remember receiving Fonseca's November 1 letter, and she did not

---

[1] Under the union administration in place in 1999 and 2000, the principal officer, Gerald Zaccagni, assigned each shop a primary and secondary business agent. The primary business agent was responsible for coordinating all meetings and correspondence for his/her shops. The primary agent was expected to communicate on all matters with the secondary agent, and the primary agent was responsible for reporting on shop issues to the principal officer. During 1999 and 2000, Joseph Brock, Jr. was the secondary agent for Coca-Cola. In November 2000, the Zaccagni slate, which included Sarah Ruszin, was defeated for re-election. Beginning in 2001, the primary/secondary designation was no longer utilized by the new administration, led by Daniel Grace and Joseph Brock, Jr.

have any further conversation with Fonseca or any Employer representative after November 1 regarding FMLA leave.[2] Fonseca and Ruszin testified that the November 1 letter is the only written acknowledgment of the alleged agreement on the FMLA issue.

The new Union administration took office in January 2001. On January 26, 2001, Brock notified Fonseca by letter that he was filing a "grievance regarding the Companies [sic] practice of mandating FMLA leave to bargaining unit employees and as such, forwarding them their accrued vacation and unused personal days". On February 12, 2001, Fonseca responded in writing that the Company "is in compliance with the federal statute, and the labor contract..." He also stated that the Union's "opposition to this policy has not been submitted on a timely basis". He reiterated the Company's intention to require employees to use paid leave time concurrent with FMLA leave.

The parties were unable to resolve this issue through the steps of the grievance procedure, and the matter was submitted for arbitration. A hearing was held on October 23, 2001, and an additional hearing was held on January 25, 2002. At hearing, both parties had a full and fair opportunity to present witnesses, documentary evidence, and argument in support of their respective positions. Both parties filed post-hearing briefs. The matter is now ripe for decision.

### Issue

The parties stipulated to the following issue,

"Whether the Company's reduction of contractual vacation and leave and the elimination of scheduled vacation leave violates the Collective Bargaining Agreement?"

---

[2] Although Ruszin's term did not expire until December 31, 2000, testimony indicated that she essentially ceased representing Coca-Cola employees after her election defeat.

## Relevant Contract Language

### ARTICLE II
### UNION RECOGNITION: SCOPE OF AGREEMENT

(a) The EMPLOYER recognizes the UNION as the sole collective bargaining agency for all employees, at its plant or plants located in Philadelphia or vicinity, in the classifications covered in Schedule "A" attached hereto.

### ARTICLE XXI
### GRIEVANCE – ARBITRATION

(a) In the event a grievance or dispute arising under the terms of this Agreement, the UNION steward shall take the matter up with the EMPLOYER's representative, and every reasonable effort shall be made to reach a satisfactory solution. If no satisfactory solution can be reached, the Business Agent or other duly authorized representative of the Union shall be notified by the UNION steward with five (5) working days of the event complained of, and the Business Agent or the duly authorized representative of the UNION shall take the matter up with the EMPLOYER within five (5) working days after the occurrence of the event complained of. If the Business Agent of the UNION and the EMPLOYER cannot reach a satisfactory agreement, the matter shall be submitted to arbitration pursuant to the American Arbitration Association's Labor Arbitration Rules.

### ARTICLE VII
### VACATIONS

(g) Vacations scheduled by EMPLOYER shall be scheduled on time per year on the basis of departmental seniority. The vacation schedule shall be posted in November. Once the vacation period has been selected and the vacation list posted, no changes will be permitted. EMPLOYER shall have the right to determine the number of employees who may take vacations within any period.

### ARTICLE XI
### MANAGEMENT RIGHTS

(a) The EMPLOYER has the sole and exclusive right to manage the affairs of the business, to determine the products, methods and schedules of production, the type of manufacturing equipment, the locations of production and to direct the working forces of the EMPLOYER. Such functions shall include (but are not limited to) the exclusive right to maintain discipline of employees, including the right to make reasonable rules and regulations, to promote, demote, or transfer employees for proper cause, to determine the amount of work needed, and to lay off because of lack of work.

## Analysis and Decision

The Union posits two main arguments in support of its grievance. First, the parties have agreed to a vacation selection procedure which specifically prohibits any change in the vacation schedule. The forwarding of vacation for FMLA purposes results in a change in the vacation schedule, contrary to the contractual language of Article VII(g). Second, the Company does not have the right to unilaterally implement the permissive language of the FMLA and thereby change the recognized past practice of not requiring employees to use paid leave concurrent with FMLA leave. Its failure to negotiate the change violated Article II (Union Recognition) of the collective bargaining agreement.

The Company likewise sets forth two main arguments. First, the grievance is untimely. The change in practice occurred as early as June 2000 and as many as eight employees were affected. A grievance was not filed until January 26, 2001, well in excess of the 5-day time limit imposed by Article XXI. Second, the Company fulfilled its obligation to bargain with the Union over the change in the FMLA leave practice[3], as evidenced by the discussions between Fonseca and Ruszin. According to the Company's brief,

> "...after a number of discussions with the Company, Ms. Ruszin agreed to the Company's right to compel employees to use paid time concurrently with FMLA leave. She further agreed on the Union's behalf that the Company's actions were not in violation of the contract. She communicated the agreement to Mr. Fonseca, members of the bargaining

---

[3] At hearing, the following exchange took place between the Arbitrator and Employer counsel:

> ARBITRATOR DE TREUX: Is it the Company's position, so I understand, that the Company has an obligation to negotiate with the Union regarding the change in this practice and then you met that obligation through the testimony?
> MR. TIERCE: Yes.
> ARBITRATOR DE TREUX: Okay, cross examine.
> MR. TIERCE: The position, if it wasn't clearly stated, was under 10 A or 11 A, the Management Rights Clause, that there are rules and regulations ability of the company, but yes, that must be negotiated with the Union and that obligation was fulfilled between Mr. Fonseca and Ms. Ruszin.

unit, and other Union officials. Therefore, because the Union explicitly agreed to the Company's implementation of its FMLA leave policy, the Union has waived its right to grieve it."

**The Obligation to Bargain**

Prior to June 2000, the Employer, contrary to its written policy, did not require employees to use paid leave time concurrent with FMLA leave. This practice presumably existed since the implementation of FMLA in 1993. As a long-standing past practice accepted by both parties, the parties had an obligation to bargain over the Company's intention to change this practice by requiring employees to use paid leave time concurrent with FMLA leave. The Union has asserted, and the Employer has agreed, that this obligation to bargain existed. This obligation under federal labor law is codified in Article II (Union Recognition) of the collective bargaining agreement. The question, therefore, is whether the conversations/discussions between Fonseca and Ruszin satisfied this obligation to bargain. For several reasons, I find that the bargaining obligation was not satisfied; and therefore, a violation of Article II occurred.

First, Fonseca and Ruszin are the only witnesses that could testify with first-hand knowledge as to the substance of the negotiations over this change in practice. Yet both were extremely vague on the details of these negotiations. Although Fonseca asserts that discussions took place in late 1999, Ruszin guessed that they may have started in spring 2000. Neither could remember dates nor even timeframes for these negotiations. In fact, Ruszin refused to characterize the discussions as "negotiations", stating that they were "conversations". The testimony of these alleged discussions were totally devoid of any detail or substance. I do not find any credible evidence that substantive discussions regarding FMLA leave were held between Fonseca and Ruszin prior to August 2000.

Second, the implementation of the new FMLA practice is inconsistent with the witnesses' assertion of the timing of an agreement. Fonseca testified that an agreement was reached sometime between August 2000 and November 1, 2000, although the

"negotiations" or "conversations" had been taking place intermittently since late 1999. However, Ruszin's August 9, 2000 letter appears to be the first written acknowledgment of the change in policy, which admittedly went into effect in June 2000 (*months before any alleged agreement*). It seems implausible that if the parties had been discussing the issue in 1999 and early 2000, Ruszin would author the August 9, 2000 letter, indicating that she is receiving calls from the members and that "there seems to be some controversy on how Philadelphia Coca-Cola administers its policy". In that letter, she requests a copy of the policy.

The letter is more indicative that the Company unilaterally implemented its policy in June 2000, and as employees were affected by the change, they notified Ruszin, who began investigating the issue. I find that the Company implemented its change in FMLA practice at least two months prior to any discussions and without any negotiation with the Union.

Third, the testimony of the Employer witnesses evidences the lack of any negotiations or agreement over the change in FMLA practice.

I credit Fonseca's testimony that there were discussions between him and Ruszin between August 2000 and November 1, 2000. However, I do not believe those discussions constituted negotiations that fulfilled the Company's obligation to bargain.

Fonseca was admittedly of the belief that the Company had the right, absent negotiations, to require employees to use paid leave time concurrent with FMLA leave. Fonseca relied on his prior experience as Human Resources Director at an Atlantic City hospital and on his reading of the Company's FMLA policy (which, as stated, was contrary to its practice). Fonseca testified as follows:

> Q. Sure. Did there come a time when the Company started applying its FMLA policy to forward people's vacation and address the issue we are here on today?
> A. Yes.
> Q. How did that come to pass, and when?

A. It came to pass, like I said, we -- this document here, my feeling was that based on the FMLA statute and my understanding of it, that we have every -- and looking at the Contract, we have every right to pay employees their time when they go out.

During the same line of questioning, Fonseca recognized only that there was "an obligation to *talk* to the Local about it and my position, like I said, was here is the policy, the way we can do it, going back and forth, and we ended up implementing it." (emphasis added)

From that and other testimony, I conclude that Fonseca believed the Company possessed the right to implement its policy as it was written, but not practiced. His discussions with the Union appear to be more of his desire to inform the Union of the Company's position rather than engage in actual negotiations over the change in practice.

Similarly, Ruszin believed the Company had the right, absent negotiations, to require its employees to use paid leave time concurrent with FMLA leave. Ruszin testified that the Company was "going to apply FMLA as it was, that they were allowed to -- the law provided for them, that they were going to require vacation time, paid personal time to be used during their time out." And when questioned about members' complaints about the change in practice, Ruszin stated, "I don't know if it was so much a complaint as it was they questioned could the Company do that. And I said yeah, the law provides that they can do that."

The obligation to bargain over the change in FMLA practice could not have been met when neither the Employer representative nor the Union representative believed there was an obligation to bargain. Further, the obligation to bargain is not waived because of the parties' representatives' mistaken understanding of their responsibilities under the law and the contract.

Fourth, the alleged agreement was not reduced to writing. Fonseca's November 1, 2000 letter is the only writing that could remotely be considered a written confirmation of an agreement. As stated above, I find that no agreement existed because neither representative believed there was an obligation to bargain. The November 1 letter then is

merely a confirmation that there were discussions between Ruszin and Fonseca between August and November[4]. In a case in which the parties are changing a long-standing practice by mutual agreement, such change is expected to be reduced to writing, signed by the parties, and presented to the membership. None of those actions took place in this instance.

Fifth, the failure of the parties to communicate this "agreement" to others is further evidence that no such agreement existed. Ruszin did not inform her fellow business agents or the membership that the matter was resolved between the parties. Ruszin testified that she told some members that the Company had the right to forward their paid leave time. But in her August letter, she reported receiving "many" calls on the "controversy". Again, in such a situation, Ruszin would be expected to present any resolution of the issue to the Union representatives and membership, yet she failed to do so.

Similarly, Fonseca did not inform Joe Brock, Jr. that he had a verbal agreement with Ruszin until just prior to the arbitration. If such an agreement existed, it is inconceivable that Fonseca would not immediately raise the existence of the agreement with Brock, Jr. when the grievance was filed on January 26, 2002.

For all these reasons, I find that the Employer did not meet its obligation under the law and Article II of the collective bargaining agreement to bargain over the change in FMLA practice to require employees to use paid leave time concurrent with FMLA leave.[5]

---

[4]The timing of the letter is also significant. As Fonseca knew, Ruszin faced re-election within days of his letter. When she lost re-election, she effectively stopped serving as business agent for the Coca-Cola employees. Fonseca never attempted to determine if Ruszin received the letter, which she apparently did not. Nor did Fonseca copy or resend the letter to Joseph Brock, Jr., the secondary agent for Coca-Cola and the newly elected President of the Union.

[5]The Union also asserts that the Company's change in FMLA practice violated Article VII(g) that prohibits any change in vacations after the vacations are selected by seniority.

**Timeliness**

I find that the Company's argument that the grievance is untimely is without merit. Article XXI of the contract requires the Union Business Agent to "take the matter up with the EMPLOYER with five (5) working days after the occurrence of the event complained of". It does not require that a formal written grievance be filed. Further, it does not require any time period before the matter is referred to arbitration.

As stated in the previous discussion, Ruszin, upon receiving complaints from the members after the implementation of the change in FMLA policy, wrote a letter to Fonseca, advising him of the complaints and, in effect, instituting her investigation. I find that Ruszin's August 9, 2000 letter started the grievance process, and therefore, the grievance is timely.

Brock, Jr.'s January 26, 2001 letter formally reduced the grievance to writing (which is not required by the contract) and, by its own language, served as the "demand for Arbitration". Brock, Jr.'s letter was not the institution of the grievance procedure, but rather the continuation of the process started (and not adequately concluded) by Ruszin.

I find the grievance to be timely.

---

I agree that the change in FMLA practice did violate the unambiguous and unqualified Article VII(g), yet such a finding addresses only the forwarding of vacation and not the forwarding of other paid leave time. As the discussion above addressed the change in FMLA practice in whole, I see no need to further detail my finding that Article VII(g) was also violated.

## Award and Remedy

The grievance is sustained.

As a remedy, the Employer is directed to immediately cease and desist from requiring employees to use paid leave time concurrent with FMLA leave unless and until such change in FMLA practice is negotiated with the Union. Further, the Employer is directed to make whole all affected employees for any loss of leave time as a result of the unilateral change in the FMLA practice.

The arbitrator will retain jurisdiction for the purposes of resolving any dispute over the remedy ordered in this matter.

WALT De TREUX   5/7/02